# UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

V.F.B, by and through her next friend, Joshua Perry,

    Plaintiff-Petitioner,

    v.

JEFFERSON B. SESSIONS III, Attorney General of the United States; DEPARTMENT OF HOMELAND SECURITY ("DHS"); KIRSTJEN NIELSEN, Secretary of DHS; U.S. CUSTOMS AND BORDER PROTECTION ("CBP"); KEVIN K. MCALEENAN, Commissioner of CBP; U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT ("ICE"); RONALD D. VITIELLO, Acting Director of ICE; U.S. CITIZENSHIP AND IMMIGRATION SERVICES ("USCIS"); L. FRANCIS CISSNA, Director of USCIS; U.S. DEPARTMENT OF HEALTH AND HUMAN SERVICES ("HHS"); ALEX AZAR, Secretary of the Department of Health and Human Services; OFFICE OF REFUGEE RESETTLEMENT ("ORR"); and SCOTT LLOYD, Director of ORR,

    Defendants-Respondents.

Civil Action No. _____

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF & PETITION FOR WRIT OF HABEAS CORPUS

Amit Jain, Law Graduate
Aseem Mehta, Law Student Intern[*]
Carolyn O'Connor, Law Student Intern[*]
Hannah Schoen, Law Student Intern[*]
Muneer I. Ahmad (ct28109)
Marisol Orihuela[†]
Michael J. Wishnie (ct27221)
Jerome N. Frank Legal Svs. Org.
Yale Law School
127 Wall Street
New Haven, CT 06511
203-432-4800
muneer.ahmad@ylsclinics.org
marisol.orihuela@ylsclinics.org
michael.wishnie@ylsclinics.org

Joanne Lewis (ct06541)
Joshua Perry[†]
Connecticut Legal Services, Inc.
16 Main Street
New Britain, CT 06051
860-357-9302
jlewis@connlegalservices.org
jperry@connlegalservices.org

*Counsel for Plaintiff-Petitioner*

[*] *motion for law student appearance forthcoming*
[†] *motion for D.Conn. admission forthcoming*

## INTRODUCTION

1.     Forty-six days ago, the United States government forcibly separated Plaintiff V.F.B., a 14-year-old girl, from her mother, as part of an abhorrent and illegal scheme to deter asylum-seekers from seeking protection from persecution in the United States. On the pretext of taking her to bathe, government officials lured V.F.B. away from her mother at a detention facility in Texas and transferred her to a shelter in Connecticut, thousands of miles from her mother.

2.     V.F.B. was held incommunicado from her mother for over a month and remains physically separated from her to this day.  The forced separation of V.F.B. from her mother was traumatic, and the ongoing separation continues to cause V.F.B. anguish and fear, and threatens even greater long-term mental, emotional, and physical harm.

3.     V.F.B. and her mother arrived in the United States in May 2018 after fleeing persecution in El Salvador.  They arrived in the United States soon after Defendants announced implementation of their "zero tolerance policy," which subjects asylum seekers to prosecution for unlawful entry and forcibly separates parents from children, for the express purpose of deterring asylum seekers from coming to the United States.

4.     V.F.B.'s mother is her primary caregiver, her source of comfort and protection, and the most important person in her life.  There is no basis to believe that V.F.B. has ever been subjected to abuse or neglect by her mother, and there is no lawful or proper basis for Defendants to separate them.

5.     Upon information and belief, Defendants have taken no steps to reunite V.F.B. and her mother, despite the President's purported disavowal of family separation.  As a result, the initial trauma of government agents secreting a 14-year-old child away from her mother has

1

been compounded by their indefinite separation and prolonged detention. This has unnecessarily inflicted, and continues to unnecessarily inflict, additional emotional harm on V.F.B. while frustrating her ability to pursue her legal claims, including asylum and the present action, without the opportunity for meaningful communication with her mother.

6.      The government's continued detention of V.F.B., and its continued, forcible separation of V.S.B. from her mother, is unlawful, and it subjects V.F.B. to ongoing harm that cannot be remediated without releasing her from detention and reuniting mother and child.

<strong>JURISDICTION AND VENUE</strong>

7.      This Court has jurisdiction pursuant to 28 U.S.C. §§ 1331, 1346, 2201-2202, 2241, and Article I, clause 9 § 2 and Article III of the U.S. Constitution.

8.      Venue is proper under 28 U.S.C § 1391 because Plaintiff V.F.B. is currently in custody of Defendants in Mystic, Connecticut and a substantial part of the events or omissions giving rise to the claims made herein occurred or are occurring in Connecticut.

<strong>PARTIES</strong>

9.      Plaintiff V.F.B. is a 14-year old national of El Salvador. She has been in the custody of the federal government for approximately 46 days. V.F.B. brings this lawsuit through a next friend as a result of her incapacity due to her minor status, her trauma-related disability, her limited access to the courts while detained, her unfamiliarity with U.S. law, and her inability to seek advice and counsel from the most important person in her life – her mother – as a result of the government's actions.

10.     Joshua Perry is Deputy Director of Connecticut Legal Services (CLS), a non-profit law firm that is dedicated to improving the lives of low-income people, including children and immigrants, by providing access to justice. CLS has established an attorney-client

2

relationship with V.F.B. to assist her in obtaining relief from removal from the United States. Mr. Perry brings this suit as next friend and on behalf of V.F.B. in order to protect V.F.B.'s rights and out of dedication to V.F.B.'s expressed interest in reuniting with her mother.

11.     Defendant Jefferson B. Sessions III is the Attorney General of the United States and is sued in his official capacity. He has responsibility for the administration of the immigration laws pursuant to 8 U.S.C. § 1103, oversees the Executive Office of Immigration Review, and is empowered to grant relief from removal.

12.     Defendant U.S. Department of Homeland Security ("DHS") has responsibility for enforcing the immigration laws of the United States.

13.     Defendant Kirstjen Nielsen is the Secretary of DHS and is sued in her official capacity. She directs each of the component agencies within DHS, including CBP, ICE, and USCIS. Defendant Nielsen is responsible for implementing U.S. immigration laws and policies, including policies related to family separation and family detention at the U.S. southern border.

14.     Defendant U.S. Customs and Border Protection ("CBP") is the sub-agency of DHS that is responsible for enforcement operations along the borders of the United States, including the southern border.

15.     Defendant Kevin K. McAleenan is the Commissioner of CBP and is sued in his official capacity. He oversees the apprehension and detention of individuals, including asylum seekers, who enter the United States at or near the U.S. border.

16.     Defendant U.S. Immigration and Customs Enforcement ("ICE") is the sub-agency of DHS that is responsible for the detention and removal operations of DHS.

17.     Defendant Ronald D. Vitiello is the Acting Director of ICE and is sued in his official capacity. He directs the nation's immigration detention system and oversees the removal

of families ordered deported at ICE detention facilities. Defendant Vitiello plays a critical role in setting detention policies that affect asylum seekers who are held in detention while they await the first steps of the asylum process.

18. Defendant U.S. Citizenship and Immigration Services ("USCIS") is the sub-agency of DHS that, through its asylum officers, conducts interviews of certain individuals apprehended at or near the border to determine whether they have a credible fear of persecution and must be permitted to apply for asylum.

19. Defendant L. Francis Cissna is the Director of USCIS and is sued in his official capacity.

20. Defendant U.S. Department of Health and Human Services ("HHS") is a department of the executive branch that is responsible for "unaccompanied" non-citizen minor children.

21. Defendant Alex Azar is the Secretary of HHS and is sued in his official capacity.

22. Defendant Office of Refugee Resettlement ("ORR") is the component of HHS that provides placement and care for "unaccompanied" non-citizen minor children and holds legal custody of V.F.B.

23. Defendant Scott Lloyd is the director of ORR and is sued in his official capacity.

## LEGAL AND FACTUAL FRAMEWORK OF FAMILY SEPARATION

### Arriving Families' Right to Seek Asylum

24. United States law entitles non-citizens on American soil to seek asylum, without regard to how they arrive. 8 U.S.C. § 1158(a)(1). Since 1996, immigration law has also provided authority for "expedited removal," or the removal of certain individuals from the United States without a removal hearing. *Id.* § 1225(b)(1)(A)(i).

25.     Even an individual subject to expedited removal, however, must receive a removal hearing if the person "indicates either an intention to apply for asylum . . . or a fear of persecution." *Id.* Under such circumstances, an asylum officer evaluates whether the individual has a "credible fear" of persecution in their home country. *Id.* U.S.C. § 1225(b)(1)(A)(ii). If an asylum officer determines that there is a "significant possibility" that such an individual could prove eligibility for fear-based relief, *id.* § 1225(b)(1)(B)(v), then the asylum seeker is placed into regular removal proceedings. *Id.* § 1225(b)(1)(B)(ii).

### The Government's Policies Before "Zero Tolerance"

26.     Prior to implementing a systematic policy of family separation in 2018, the government did not detain some families apprehended at the border at all, instead placing them in regular removal proceedings. For others, the government followed expedited removal procedures, and detained members of these families together. If Defendants found these family members to have a credible fear of persecution, they would release the family from detention.

27.     When the government decides to detain children, it is subject to the *Flores* Settlement, which implements a "general policy favoring release" of minors. *See* Settlement Agreement, *Flores v. Reno,* No. CV-85-4544-RJK (C.D. Cal. Jan. 17, 1997)*, available at* https://tinyurl.com/y9fxrbsp (hereinafter "*Flores* Settlement"). The *Flores* Settlement "unambiguously applies both to accompanied and unaccompanied minors" in DHS custody, *Flores v. Lynch*, 828 F.3d 898, 901 (9th Cir. 2016), and requires the government to "place each detained minor in the least restrictive setting appropriate to the minor's age and special needs…." *Flores* Settlement ¶ 11.

28.     Under the settlement, children must be released from detention within five days, or within twenty days in certain emergency circumstances, to a parent, legal guardian, adult

relative, adult designated by a legal guardian, or (if none of these individuals are available) a licensed program willing to accept legal custody. *Id.* ¶¶ 12, 14.

29.     Starting in January 2016, the government piloted the Family Case Management Program ("FCMP") as an "alternative to detention . . . initiative that use[d] qualified case managers to promote participant compliance with their immigration obligations" through a wrap-around service model. The ICE Office of Inspector General determined that the FCMP was 99 percent effective at ensuring participant attendance for ICE check-ins and appointments, and 100 percent effective at ensuring attendance for court hearings. *U.S. Immigration and Customs Enforcement's Award of the Family Case Management Program Contract (Redacted)*, DHS Office of Inspector General, at 5 (OIG-18-22) (Nov. 30, 2017), *available at* https://tinyurl.com/y96l9t8y. Nevertheless, the government closed the program in June 2017.

## The Government's "Zero Tolerance" Family Separation Policy

30.     In early 2017, DHS contemplated changing its policy on asylum-seeking families by implementing family separation to deter migration from Central America into the United States. In March 2017, then-DHS Secretary John Kelly stated that he was considering separating arriving children from their parents "in order to deter more movement" into the United States. Daniella Diaz, *Kelly: DHS Is Considering Separating Children From Their Parents At the Border*, CNN (Mar. 6, 2017), *available at* https://tinyurl.com/yctz5qct.

31.     On May 7, 2018, Defendant Sessions announced a "zero tolerance policy" of coercive family separation in order to deter asylum seekers and other migrants from crossing into the United States. Defendant Sessions explained, "If you cross this border unlawfully, then we will prosecute you. It's that simple. . . . If you are smuggling a child, then we will prosecute you and that child will be separated from you . . . ." Remarks Discussing the Immigration

Enforcement Actions of the Trump Administration (May 7, 2018), *available at* https://tinyurl.com/ybqbfubb.

32.     The government applied its "zero-tolerance policy" against parents who crossed the border with their own children seeking asylum, including V.F.B. Defendants have forcibly separated over 2,300 children from their parents while crossing the border, some only months old. Faith Karimi & Tal Kopan, *There Are 2,300 Migrant Kids Spread Across the U.S. What Happens to Them Next?*, CNN (June 21, 2018), *available at* https://tinyurl.com/ybjtxyz5.

33.     Children forcibly separated from their parents were transferred to the custody of the Office of Refugee Resettlement ("ORR"), a component of HHS, and sent to shelters and temporary housing. ORR deems these children as "unaccompanied minors."

34.     Under ORR policies, a child will be released from ORR custody only after ORR undertakes an onerous and lengthy procedure to determine that a potential custodian, or "sponsor," is suitable for providing for the child's physical and mental well-being. Office of Refugee Resettlement, *Children Entering the United States Unaccompanied*, *available at* https://tinyurl.com/y9ccsgeo.

35.     In the face of widespread public condemnation of coerced family separation as a grave violation of American values, President Trump purportedly retracted the policy on June 20, 2018. Exec. Order, *Affording Congress an Opportunity to Address Family Separation*, 2018 WL 3046068 (June 20, 2018) (hereinafter "EO"). The EO continued the policy of initiating criminal proceedings for all individuals who crossed the border without authorization; however, in place of systematic separation of families, the EO called for indefinite detention of families in camps and makeshift facilities. *Id.*

## The Government's Ongoing Failure to Reunify Families

36.     The EO did not include any provisions to reunite families that had been separated

at the border, nor did it purport to remediate the trauma or other harms caused by family

separation.

37.     DHS has not disclosed any process for reunification of families prior to removal,

including during the pendency of asylum claims, which may last for months. In litigation in the

U.S. District Court for the Southern District of California, Defendants did not dispute that they

had "no plans or procedures to reunify the parent with the child other than arranging for them to

be deported together after the parent's immigration case is concluded." *Ms. L. v. ICE*, __ F.

Supp. 3d __, 2018 WL 3129486, at *5 (S.D. Cal. June 26, 2018) (internal quotations omitted).

The court found that "under the present system migrant children are not accounted for with the

same efficiency and accuracy as *property*." *Id.* at *7 (emphasis in original).

## The Racial Animus Underlying Coerced Family Separation

38.     The Trump Administration adopted its policy of coerced family separation as a

central part of an anti-immigrant agenda, motivated primarily by racial animus against

individuals of Hispanic origin and individuals from Central America.

39.     On the first day of his presidential campaign, Candidate Trump stated: "When

Mexico sends its people, they're not sending their best. . . . They're bringing drugs. They're

bringing crime. They're rapists. And some, I assume, are good people." *Donald Trump*

*Announces a Presidential Bid*, WASH. POST (June 16, 2015), *available at*

https://tinyurl.com/gl6ofm5.

40.     Since taking office, President Trump has consistently pursued immigration

policies motivated by racial animus against non-European immigrants. In summer 2017, he

stated that the 15,000 Haitians admitted to the United States "all have AIDS," and expressed

concern that Nigerian nationals in the United States would never "go back to their huts" in

Africa. Aaron Blake, *Trump's 'shithole' comment about Haiti lends credence to report he said*

*Haitians 'all have AIDS',* WASH. POST (Jan. 11, 2018), *available at*

https://tinyurl.com/ybspu5qa.

41.   In January 2018, President Trump complained about protections for individuals

from specific Central American and African countries, asking why the United States was

admitting "all these people from shithole countries," as opposed to countries like Norway. *Id.* In

May 2018, President Trump characterized certain unauthorized migrants as "animals." Jamelle

Bouie, *The "Animal" Debate is Over,* SLATE, June 19, 2018, https://tinyurl.com/yckbshah. The

next month, defending his coerced family separation policy, the President alleged that families

crossing the border with their children "could be murderers and thieves and so much else," and

warned that "[t]he United States will not be a migrant camp. . . ." *Id.*

42.   The Administration's shifting race-neutral explanations for coerced family

separation are pretextual. President Trump falsely asserted that family separation was required

under an unnamed law, but he unilaterally ended the policy through an executive order two days

later. DHS Secretary Nielsen claimed that the policy was necessary due to arriving adults and

children fraudulently claiming to be family units, but less than one percent of families

apprehended at the border made such fraudulent claims. Linda Qiu, *Fact-Checking the Trump*

*Administration's Case for Child Separation at the Border*, N.Y. TIMES (June 19, 2018),

*available* at https://tinyurl.com/yddv5oef. And although President Trump falsely asserted that 80

percent of individuals who were released pending immigration hearings failed to appear, most

such individuals do in fact appear for their immigration hearings. Noah Bierman, Sarah D. Wire,

& Eli Stokols, *Trump Orders End to His Family Separation Policy at the Border, but Relief Could Be Temporary*, L.A. TIMES (June 20, 2018), *available at* https://tinyurl.com/yaq2a2hg.

## FACTUAL ALLEGATIONS

43.     V.F.B. and her mother arrived in the United States in May 2018, after fleeing persecution in El Salvador.

44.     V.F.B.'s mother is her primary caretaker and has been during V.F.B.'s entire life. V.F.B. is emotionally close to her mother and relies upon her more than anyone else in her life. V.F.B. does not have a relationship with her father or his family.

45.     V.F.B.'s step-father was killed in 2017 outside a church in El Salvador while she and her mother waited for him inside.  Because of the murder, V.F.B. and her family moved in order to avoid a similar fate. Eventually V.F.B. and her mother fled El Salvador in order to save their lives and avoid official persecution.

46.     Upon information and belief, V.F.B and her mother were detained in Texas by CBP officials soon after they arrived in the United States.

47.     Upon information and belief, V.F.B. and her mother both expressed to CBP officials a fear of returning to El Salvador.

48.     Defendants initially detained V.F.B. and her mother together, first at a detention facility that V.F.B. knows as the "hielera," or "freezer" in Spanish, at a CBP facility in Texas. Upon information and belief, V.F.B. and her mother were in CPB custody at the time that they were forcibly separated.

49.     During the time that V.F.B. and her mother were in government custody in Texas, government agents took V.F.B. away from her mother to bathe.  Although she expected to see her mother after showering, she never did.  That was the last time that V.F.B. saw her mother.

50.     Over the course of two days, V.F.B. asked government agents multiple times about the whereabouts of her mother.  Each time, officers told V.F.B. that they would go and look for her mother in a room used to hold adults, and each time they subsequently told V.F.B. that her mother was not there.  Eventually, government agents told V.F.B. that her mother was detained.

51.      On or about May 17, 2018, ORR placed V.F.B. with Noank Community Support Services, Inc., a non-profit agency based in Groton, Connecticut that contracts to house children in custody of the federal government. Noank Community Support Services receives federal funding as a result of its contract with ORR, but does not offer legal representation. V.F.B. has been held in ORR custody at Noank Community Support Services since on or about May 17. She arrived in Connecticut after taking two planes and a car.

52.     V.F.B. was allowed to speak to her mother by telephone for the first time on or about June 25, 2018, approximately 39 days after they were forcibly separated.  The call lasted approximately ten minutes, and shelter staff were in the room during that time.  V.F.B. and her mother were so distraught that they cried for nearly the entire call and as a result were unable to more meaningfully communicate with one another.  V.F.B. does not know when she will next be allowed to speak with her mother.

53.     Defendants' actions in separating V.F.B. from her mother, together with Defendants' other actions and failures to act, caused significant and immediate mental and emotion harm to V.F.B. and threaten even greater long-term harm.

54.     On information and belief, V.F.B. has been exposed to significant traumatic events in her young life, including the murder of her step-father.  In the face of this trauma, her mother has been her primary caregiver and source of protection and strength.  To an even greater

11

extent than other children her age, V.F.B. relies on the love and support of her mother to help her survive a terrifying world.

55.     V.F.B. manifests numerous symptoms of Post-Traumatic Stress Disorder (PTSD), and on information and belief, suffers from chronic PTSD. Defendants' actions, including taking her away from her mother under pretense of bathing, and then separating her halfway across the country, are exacerbating V.F.B.'s PTSD.  Having already lost one caregiver—her step-father— V.F.B. is at risk of severe retraumatization by virtue of the government's forcible separation of her from her mother. V.F.B. has trouble concentrating and thinking, as a result of her disability, which is amplified by Defendants' actions.

56.     V.F.B. has been distraught as a result of the government's forcible separation of her from her mother.  She has cried on a regular basis following the separation and is concerned for her safety and that of her mother.  Upon information and belief, V.F.B. has suffered, and continues to suffer, significant psychological harm as a result of the government's forcible separation of her from her mother.

57.     Defendants' actions are not only causing short-term trauma but also threaten significant long-term damage to V.F.B.  Childhood trauma and enforced separation from loved ones carries a dramatically increased risk of long-term psychiatric illness, including major depressive disorder, and anxiety disorders. Children who have suffered from trauma are also at significantly increased risk of physical illness.

58.     V.F.B.'s mother is currently detained by ICE at the Lasalle County Regional Detention Center in Encinal, Texas.

59.     Upon information and belief, V.F.B.'s mother is not represented by counsel.

60.     V.F.B.'s counsel, CLS, has made repeated attempts to contact V.F.B.'s mother, but to date has been unable to do so.  Neither V.F.B. nor CLS have been able to discuss V.F.B.'s legal claims, including those made in the present action, with V.F.B.'s mother.

61.     The government does not have any legitimate interest in separating V.F.B. from her mother. There is no allegation that V.F.B.'s mother is an unfit parent.

62.     V.F.B. has expressed to CLS her desire to be reunited with her mother and her fear if returned to El Salvador.

63.     On information and belief, V.F.B. has no relatives in Connecticut. V.F.B. does not know whether Defendants will reunite her with her mother or when she can see her mother next. During the one phone call she has been permitted with her mother, V.F.B. was unable to discuss her legal rights, including the issues presented in the present action.

64.     V.F.B. requests an order that Defendants immediately release her into the custody of her mother, or to such other suitable adult as her mother may direct.

## CAUSES OF ACTION

### COUNT I
### (Violation of Substantive Due Process)

65.     All of the foregoing allegations are repeated and realleged as though fully set forth herein.

66.     The Due Process Clause of the Fifth Amendment applies to all "persons" on United States soil and thus applies to V.F.B.

67.     V.F.B. has a liberty interest under the Due Process Clause in remaining together with her mother as a family.

68.     The separation of V.F.B. from her mother violates substantive due process because it furthers no legitimate purpose, much less a compelling governmental interest.

## COUNT II
### (Violation of Procedural Due Process)

69.    All of the foregoing allegations are repeated and realleged as though fully set forth herein.

70.    The Due Process Clause of the Fifth Amendment applies to all "persons" on United States soil and thus applies to V.F.B.

71.    V.F.B. has a liberty interest under the Due Process Clause in remaining together with her mother as a family.

72.    The separation of V.F.B. from her mother violates procedural due process because it deprived V.F.B. of her protected liberty interest without notice or any opportunity to be heard.

## COUNT III
### (Violation of Section 504 of the Rehabilitation Act)

73.    All of the foregoing allegations are repeated and realleged as though fully set forth herein.

74.    Section 504 of the Rehabilitation Act of 1973 ("Section 504") provides that "no otherwise qualified individual with a disability . . . shall, solely by reason of his or her disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving federal financial assistance." 29 U.S.C. § 794(a).

75.    Disability is defined to include "a physical or mental impairment that substantially limits one or more major life activities . . ." 29 U.S.C. § 705(20)(B); 42 U.S.C. § 12102.

76.    V.F.B. suffers from the effects of chronic trauma and acute PTSD. The effects of chronic trauma cause an impairment that limits V.F.B.'s ability to concentrate, think, and communicate. V.F.B. thus has a physical or mental impairment that substantially limits one or more major life activities.

77.     Defendants' separation of V.F.B. from her mother and decision to detain her mother thousands of miles away exacerbate V.F.B.'s existing limitations in communication, including when relating her past trauma. As a result, V.F.B. faces barriers in presenting her claims and is being denied equal and equally effective access to the asylum process on the basis of disability.

78.     V.F.B. is "otherwise qualified" to participate in any removal proceedings currently pending against her and in affirmative asylum proceedings, as well as in the programs and activities of her temporary placement by ORR in a children's shelter.

79.     The children's shelter at which V.F.B. is currently detained by ORR has received substantial federal financial assistance. Immigration proceedings, including asylum adjudications before USCIS and removal proceedings prosecuted by ICE before an Immigration Judge, are federal programs.

80.     The regulations implementing Section 504 prohibit entities receiving federal financial assistance from utilizing "criteria or methods of administration (i) that have the effect of subjecting qualified handicapped persons to discrimination on the basis of handicap, (ii) that have the purpose or effect of defeating or substantially impairing the accomplishment of the objectives of the recipient's program or activity with respect to handicapped persons." 34 C.F.R. § 104.4(b)(4).

81.     In separating V.F.B. from her mother and detaining daughter and parent thousands of miles apart, the Defendants have exacerbated V.F.B.'s disabilities, interfered with her ability to meaningfully participate in immigration proceedings, excluded her from the protections afforded by the asylum statutes, and discriminated against V.F.B. on the basis of her disability.

82. Defendants have a legal duty to provide reasonable accommodations to V.F.B. to ensure her meaningful access to the federal program of asylum and removal proceedings.

83. V.F.B. has provided Defendants with notice of her disabilities and requested reasonable accommodations no later than service of this pleading. Defendants have not granted these requests.

84. There are effective reasonable accommodations that Defendants could implement. In particular, Defendants could immediately cease the forced separation of V.F.B. from her mother. Defendants have failed to implement any reasonable accommodations.

85. The reasonable accommodation requested by V.F.B. would not be unduly burdensome nor would it require a fundamental alteration in the program. The burden of showing that any such relief or accommodation would require a fundamental alteration or pose an undue burden rests with Defendants. 6 C.F.R. § 15.50(a)(2).

86. By forcibly separating V.F.B. from her mother, Defendants have denied V.F.B. equal and effective access to a federal program.

87. As a result of this discrimination and failure to reasonably accommodate V.F.B.'s disabilities, and solely based on her disability, V.F.B. cannot receive the benefits of the asylum process or the placement by Defendants in a children's shelter in Connecticut.

## COUNT IV
### (Violation of Administrative Procedure Act)

88. All of the foregoing allegations are repeated and realleged as though fully set forth herein.

89. The Administrative Procedure Act ("APA") prohibits agency action that is arbitrary and capricious.

90.     The forcible separation of V.F.B. from her mother and the decision to detain them thousands of miles from one another constitutes final agency action under the APA.

91.     Defendants' separation of V.F.B. from her mother without a legitimate justification is arbitrary and capricious and accordingly violates the APA. 5 U.S.C. § 706.

92.     ORR's decision to apply its policies and procedures for "sponsoring" an "unaccompanied alien child" to the parents who were forcibly separated from their children by the U.S. government is also a final agency action for purposes of the APA.

93.     In light of ORR's mission to "promptly place" minors into "the least restrictive setting that is in the best interest of the child," ORR's insistence that V.F.B. remain detained and separated from her mother is arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law.

## COUNT V
### (Violation of Equal Protection Guarantee)

94.     All of the foregoing allegations are repeated and realleged as though fully set forth herein.

95.     The Fifth Amendment contains an implicit guarantee of equal protection that invalidates any official action that in part reflects a racially discriminatory intent or purpose. Classifications based on race or national origin receive exacting scrutiny, and even facially neutral policies and practices will be held unconstitutional when they reflect a pattern unexplainable on grounds other than race or national origin.

96.     Defendants' decisions to separate families from Central and South America arriving at the southern border seeking asylum, and to isolate children in detention facilities separate from their parents, are unconstitutional because they were motivated, at least in part, by intentional discrimination based on race, ethnicity, and/or national origin. This intentional

discrimination includes bias against immigrants perceived to come from Central or South American countries.

97.     As a result of these decisions, including the decisions that have caused the separation of V.F.B. from her mother, V.F.B. has been and is being denied equal protection.

**COUNT VI**
**(Declaratory Judgment Act)**

98.     All of the foregoing allegations are repeated and realleged as though fully set forth herein.

99.     The Declaratory Judgment Act, 28 U.S.C. §§ 2201-2202, provides that "[i]n a case of actual controversy within its jurisdiction . . . any court of the United States . . . may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought." 28 U.S.C. § 2201(a).

100.     There is an actual controversy between the parties because Defendants have refused to immediately release V.F.B. The Court should exercise its authority under the Declaratory Judgment Act to declare that Defendants have no basis to refuse to release V.F.B. and to order Defendants to immediately release V.F.B., into the custody of her mother or another suitable relative as directed by her mother.

**PRAYER FOR RELIEF**

WHEEFORE, Plaintiff respectfully requests that the Court enter a judgment against Defendants and award the following relief:

A.     Declare that Defendants have no basis to hold or maintain custody over V.F.B.;

B.     Declare that Defendants' failure to reasonably accommodate V.F.B.'s disabilities, or their failure to provide V.F.B. equal and effective access to a federal program, violates Section 504 of the Rehabilitation Act of 1973;

C.      Declare that Defendants must immediately release V.F.B. into the custody of her mother, or to such other suitable adult as her mother may direct;

D.      Order Defendants to produce the mother of V.F.B. in the District of Connecticut, on a writ of habeas corpus *ad testificandum* or otherwise, so that she may visit in person with her daughter V.F.B. so as to advise this Court whether V.F.B.'s mother requests her daughter's immediate release to another suitable relative or continued detention, together with her mother, for as long as Defendants detain them both;

E.      Preliminarily and permanently enjoin Defendants from continuing to separate V.F.B. from her mother and from refusing to release V.F.B. into the custody of her mother, or to such other suitable adult as V.F.B.'s mother may direct;

F.       Grant a writ of Habeas Corpus requiring Defendants to release V.F.B. immediately to the custody of her mother or such other suitable relative as her mother may direct, or issue an order directing the Defendants to show cause within three days why the writ should not be granted, pursuant to 28 U.S.C. § 2243;

G.      Require Defendants to pay Plaintiff's reasonable attorneys' fees and costs; and

H.      Grant all other relief that is just and proper.


Dated: July 2, 2018
New Haven, Connecticut

Respectfully submitted,

/s/ Muneer I. Ahmad

Amit Jain, Law Graduate                           Joanne Lewis (ct06541)
Aseem Mehta, Law Student Intern[*]                Joshua Perry[†]
Carolyn O'Connor, Law Student Intern[*]           Connecticut Legal Services, Inc.
Hannah Schoen, Law Student Intern[*]              16 Main Street
Muneer I. Ahmad (ct28109)                         New Britain, CT 06051
Marisol Orihuela[†]                               860-357-9302

Michael J. Wishnie (ct27221)
Jerome N. Frank Legal Svcs. Org.
Yale Law School**
127 Wall Street
New Haven, CT 06511
203-432-4800
muneer.ahmad@ylsclinics.org
marisol.orihuela@ylsclinics.org
michael.wishnie@ylsclinics.org

jlewis@connlegalservices.org
jperry@connlegalservices.org

*Counsel for Plaintiff-Petitioner*

[*] Motion for law student appearance forthcoming.
[†] Application for admission forthcoming.
[**] This complaint and petition has been prepared by a program affiliated with Yale Law School, but does not purport to present the school's institutional views, if any.